Hillsborough,
No. 4853.

ESTHER GORMAN

*v.*

NEW ENGLAND TELEPHONE & TELEGRAPH COMPANY

AND

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE.

Argued February 7, 1961.

Decided June 30, 1961.

338

*Devine, Millimet & McDonough* and *Hamblett, Kerrigan & Hamblett* (*Mr. Millimet* orally), for the plaintiff.

*Burns, Bryant & Hinchey* (*Mr. Bryant* orally), for the defendant New England Telephone & Telegraph Company.

*Sulloway, Hollis, Godfrey & Soden* and *Joseph S. Ransmeier* (*Mr. Ransmeier* orally), for the defendant Public Service Company of New Hampshire.

KENISON, C. J. One of the key factual issues in this case was whether the automobile that collided with the utility pole was operated by the plaintiff or by one Delude. The latter was somewhat a phantom witness since, although he was present in court, he was not called to testify by the plaintiff's counsel or by counsel for either defendant. Inasmuch as the evidence was highly conflicting, cross-examination was vigorous and the case was tried for nine days by competent counsel, it may be assumed that all counsel exercised good judgment in not calling this witness. There was evidence that the plaintiff had been drinking some and it was more probable than otherwise that Delude had been drinking more. In any event, it was stipulated by plaintiff's counsel that whoever was driving the car was negligent and the case was submitted to the jury under an instruction which denied the plaintiff any recovery unless she proved to be a passenger in the car.

The accident occurred sometime after 5:30 in the morning as the driver made a lefthand turn on to Stevens Avenue, striking a picket fence on the right (west) side of Stevens Avenue near the corner, breaking a number of pickets. It continued south along Stevens Avenue on the west side of the street striking a glancing blow against the left rear bumper and fender of a parked car which was about eighty-eight feet distant from the corner. The car then traveled across the street eighty-one feet further to collide with the utility pole maintained on the east side of the street by the defendants.

The defendants claim their motions for nonsuits, directed verdicts and judgment notwithstanding the verdicts should have been granted if the proper interpretation is placed upon RSA 254:18. That statute reads as follows: "To PARTY INJURED. They shall also be responsible directly to any party receiving injury in his person or estate from any pole or structure or underground conduit or cable or any wire or other attachment or appurtenance thereto, which has been constructed or maintained by any such proprietor without valid license or which has been constructed, maintained,

or operated under a valid license but in a negligent manner, or in an improper location." The plaintiff's contention is that this statute makes the defendants liable if the pole in this case was unlicensed, maintained within the limits of the highway, and if its presence caused or helped to cause her injuries, providing she herself was without fault. RSA 254:2, 10 are also relevant and are quoted at this point: "254:2 AUTHORITY TO ERECT. Telegraph, television, telephone, electric light and electric power poles and structures and underground conduits and cables, with their respective attachments and appurtenances may be erected, installed and maintained in any public highways and the necessary and proper wires and cables may be supported on such poles and structures or carried across or placed under any such highway by any person, copartnership or corporation as provided in this chapter and not otherwise."

"254:10 INTERFERENCE WITH TRAVEL. The location of poles and structures and of underground conduits and cables by the selectmen shall be made so far as reasonably possible so that the same and the attachments and appurtenances thereto will not interfere with the safe, free and convenient use for public travel of the highway or of any private way leading therefrom to adjoining premises or with the use of such premises or of any other similar property of another licensee; and the location of any such pole or structure or underground conduit or cable, when designated by the selectmen pursuant to the provisions hereof, shall be conclusive as the right of the licensee to construct and maintain the same in the place located without liability to others, except for negligence in the construction, operation, or maintenance of the same or of the attachments and appurtenances thereto and except as is expressly provided herein. In no event shall any town or city or any official or employee thereof or of the state department of public works and highways be under liability by reason of the death of or damage sustained by any person or to any property occasioned by or resulting from the location, construction, or maintenance of any pole, structure, conduit, cable, wire, or other apparatus in any highway, pursuant to the provisions hereof."

The defendants' claim, stated in a variety of ways, is in essence that the interpretation of the statute urged by the plaintiff and implemented in the Court's charge rests upon the assumption that the pole was a public nuisance and made them liable without fault in accordance with the discredited doctrine of *Johnson* v. *Railroad*,

83 N. H. 350, which was overruled in *Vassillion* v. *Sullivan,* 94 N. H. 97. It is not seriously disputed that the Legislature could have imposed absolute liability on utilities locating an unlicensed pole within the limits of a public highway. *Hayes* v. *Company,* 86 N. H. 486, 493. See also, *Beard* v. *Railroad,* 99 N. H. 469. The defendants assert that the Legislature did not do so in RSA 254:18 but that the Court in effect so charged the jury.

All parties rely upon the detailed history of the legislation and the decisions relating to the liability of utilities beginning many years ago (Laws 1877, *c.* 50) to prove their respective claims as to the meaning of RSA 254:18. *Hayes* v. *Company,* 86 N. H. 486, *supra; Labor* v. *Public Service Company,* 92 N. H. 256; *Twardosky* v. *Company,* 95 N. H. 279. It is believed that no useful purpose would be served by again making an exhaustive analysis of these numerous statutes, their revisions and the cases thereunder. The increasing legislative concern to guard against the danger created by poles situated within public highways under modern traffic conditions with its mounting hazard, is both understandable and obvious from the trend of the laws enacted. The objectives of the statutory provisions governing this case appear threefold: first, that no poles be erected without a license (RSA 254:2); secondly, that a license should issue only for poles located so as not to interfere with safe traffic (RSA 254:10); and thirdly, that the ultimate responsibility be placed on the utilities for injuries resulting either from an unlicensed pole or from a licensed one if negligently located or maintained. RSA 254:18.

In the present case the Court charged the jury, in pertinent part as follows: "It is up to you to consider all of the evidence and decide whether this pole was or was not within the limits of the highway. If the pole was not within the limits of the highway, then the statute does not apply, and the defendants cannot be at fault and you should return a verdict for the defendants. But if you find that the pole was in the highway — within the limits of the highway — then the statute does apply, and you should consider the plaintiff's claim as to whether the defendants are at fault.

"Now, the defendants had no license to erect and maintain this pole, and it was therefore a public nuisance under the terms of the statute if it was within the limits of the highway, and the defendants are at fault if the pole caused or helped cause the accident. It does not have to be the sole cause, but it must be one of the causes of the accident in order for the defendants to be held to

have been at fault. If the accident would have happened anyway, even if the pole had not been there, then the pole was not a cause of the accident and the defendants would not be at fault; but if the pole was a cause of the accident, then the defendants would be at fault.

"It is not material on this issue whether the pole was in a reasonably safe position; its presence there in the highway was illegal, if you find that it was within the limits of the highway, no matter how long it had been there, and the defendants were at fault if the pole was a cause of the accident." While the mention of nuisance by the Court in the instructions was not essential, the charge makes it clear that causal fault alone and not nuisance was made the basis of the defendants' liability. Accordingly we hold the Trial Court committed no error when it instructed the jury that if they found the unlicensed pole was within the limits of the highway and that it caused or helped to cause the plaintiff's injuries, the defendants were liable.

This holding is not a return to the theory of "absolute liability" under the obsolete doctrine of the *Johnson* case as the defendants contend. In the present case in order for the plaintiff to prevail she had to convince the jury, as charged by the Court, that "the pole caused or helped to cause the accident." Furthermore the jury was told that "if the accident would have happened anyway, even if the pole had not been there, then the pole was not a cause of the accident and the defendants would not be at fault . . . . " Stated in a different manner, the causal effect of defendants' maintenance of the unlicensed pole was submitted to the jury as a question of fact, and the jury was instructed that if the plaintiff was found to have been the operator of the automobile, her contributory negligence would bar her recovery as a matter of law. *Vassillion* v. *Sullivan*, 94 N. H. 97, 100, 101. The defendants' fault was established by their failure to obtain a license. Under the statute they became "responsible directly to any party receiving injury." RSA 254:18. That the pole was the cause of the injury was determined by the jury as a question of fact. It was thus determined that the violation of the statute (RSA 254:2) was causal, and hence there was legal fault subjecting the defendants to liability.

It follows that the defendants' exceptions to the denial of their motions for nonsuits, directed verdicts and for judgment notwithstanding the verdicts, based upon their contention that the statute was wrongly interpreted, are overruled.

As a further ground for these motions, the defendants argue that it could not be found that the pole was within the limits of the highway, or that its presence was causal, or that the plaintiff was not herself driving the car at the time of the accident. In passing upon all these questions, we must "consider the evidence for the plaintiff as true and to construe all the evidence most favorably to the plaintiff." *Lamarche* v. *Granite State &c. Ins. Co.*, 101 N. H. 210, 212.

With reference to the position of the pole, we must bear in mind that the jury had a view which may have furnished a vital part of the evidence (*Gelinas* v. *Portsmouth*, 97 N. H. 248, 251), as well as pictures, plans and the testimony of witnesses, some of whom had been acquainted with Stevens Avenue for years. Without detailing the voluminous evidence, it appears that there were stone boundaries on the road plans in the city engineer's office, and testimony by the defendant Public Service Company's manager and by residents of the street which, combined, afford an ample basis for the jury's finding that the pole was within the limits of the highway and that the public nature of the road was established. In addition to this, the jury could consider that the defendants introduced no evidence that the pole was located on private property, since it appears that it would have been reasonable for them to have done so had this been a fact susceptible of proof. *Sargent* v. *Alton*, 102 N. H. 476, 479.

Whether the presence of the pole was causal was also clearly for the jury. It cannot be said that all reasonable persons must agree that the plaintiff would have suffered her injuries if it had not been there. It was findable that the car might have passed the corner of the adjacent house and continued on in safety. It is also reasonable that the jury could believe that the pole was a substantial factor in causing the injuries of which the plaintiff complains. Restatement, Torts, *s.* 431 (a) and (b).

The issue of the plaintiff's contributory negligence, which centers mainly on the question of whether she or her companion Delude was operating the car, presents more difficulty. The defendants urge that her own admissions to the police when she said in effect that she thought she was driving or that "to the best of her knowledge" she was driving at the time of the accident are conclusive. However, she also stated shortly after the accident that "she did not recall whether she drove all the way or not." On the stand she flatly and repeatedly denied that she was operating at the time of

the collision. She stated that what she first said was to protect Delude because she was keeping company with him at the time and he asked her to take the blame.

In this state of the record, we cannot say as a matter of law that her admissions are decisive against her or that the truth of her conflicting testimony was not for the jury to resolve. *Lampesis* v. *Comolli*, 101 N. H. 279, 284. The defendants further argue that the testimony of witnesses who immediately after the accident saw Delude get out of the "passenger side" of the car and start away, together with the nature of his injuries and those of the plaintiff, the damage to the windshield and the fact that there was testimony that the plaintiff was seen to be on the driver's side of the seat with her feet in the vicinity of the pedals, must be held absolute proof that she was the operator. However, the jury were free to accept or reject such portions of contradictory testimony as they saw fit. *Giguere* v. *Railroad*, 86 N. H. 294, 298. The witness who placed the plaintiff on the driver's side on direct examination qualified this on cross-examination by saying she appeared to be about in the center of the seat of the car. Further, they could draw the inference, as the plaintiff argues, that Delude hurried away from the scene of the accident because he was driving and had been drinking and did not wish to have this disclosed. As to the facts, "postulating a physical impossibility" with reference to the plaintiff's claim that she was not the driver (*Brown* v. *Mailhot*, 89 N. H. 240, 241), we cannot agree. See *Labor* v. *Public Service Co.*, 92 N. H. 256, 259. While the evidence is persuasive, nevertheless we bear in mind that when a moving automobile strikes a stationary object at an angle as it did here, persons may be thrown violently about without leaving an exact traceable pattern. The injuries to the plaintiff were consistent with her being thrown against the dash rather than the wheel, as the defendants assert. In all the circumstances, we cannot hold as a matter of law that the plaintiff's claim postulates a physical impossibility.

We therefore overrule the defendant's exceptions to the denial of their motions for nonsuits, directed verdicts and judgments notwithstanding the verdicts, based upon the above several grounds and upon the further ground that the verdicts were contrary to and against the weight of the evidence. *Wisutskie* v. *Malouin*, 88 N. H. 242; anno. 3 A. L. R. 2d 6.

It is urged that a new trial should be granted because the jury deliberated after midnight. RSA 519:25 reads as follows:

"LODGING. Jurors shall not be required to continue their deliberations without sleep and rest later than twelve o'clock in the evening. At that hour, or earlier, under such safeguards and conditions as the court may direct, they shall be afforded suitable opportunity for sleep and rest, at the expense of the county, for at least eight hours before again taking up their deliberations. No separation for sleep or rest of men and women serving upon any jury shall work a mistrial in any civil or criminal case, if such jury is at all times in charge of a sheriff." In *Kellogg* v. *Eastman*, 86 N. H. 37 the court set aside a verdict where the jury deliberated until 1:30 A. M. and had not been advised of the statute. In the case at bar the jury was informed of the statute just prior to midnight and were advised that reservations had been made for them at the hotel and were also advised that they should "cease deliberations as of now" unless they should unanimously agree to consider the case further. At 12:05 A. M. the jury returned to the courtroom and the Court inquired of each juror if they had agreed "to work a little longer" and each juror answered in the affirmative. At 12:32 the jury returned with a verdict for the plaintiff. The jury had originally retired to consider the case at 5:45 in the afternoon. This procedure was not a violation of the statute since the jury was not "required" to continue their deliberations but rather volunteered to do so under proper instructions from the Court. See *Dunne* v. *Carey*, 97 N. H. 43.

Error is predicated on the refusal of the court to interrogate the jury after the verdict was returned. The Presiding Justice gave the matter careful consideration, examined affidavits and counter affidavits of the jurors, as well as written arguments submitted by counsel and denied the motions to set aside the verdict only after a considerable period of time had elapsed after trial. We cannot say there was any abuse of discretion in the circumstances of this case. *Caldwell* v. *Yeatman*, 91 N. H. 150; VIII Wig. Ev. s. 2349.

Various exceptions were taken to the admission and exclusion of evidence but an examination of each one discloses no prejudicial error. In some instances the testimony excluded was already in evidence and was only cumulative; in other instances hearsay was involved and the exclusion of the evidence was proper and other matters involved the scope and extent of cross-examination which was not unduly limited. No knotty problems in the law of evidence are presented which warrant detailed discussion but a few examples may be noted. The plaintiff on cross-examination was asked the

following questions, the first of which she answered and the second was upon exception excluded. "Q. Miss Gorman, Mr. Delude is in this courtroom right now? You see him do you not? A. Yes. Q. Do you know whether any arrangements or plans have been made to have him testify as a witness in your behalf in this case, and tell this jury what he did in the way of driving, and what transpired on the night of the accident?" Throughout the trial it was clear that neither the plaintiff nor the defendants wanted the heavy burden of calling Delude as *their* witness and the Court declined the suggestion of counsel that he call the witness to testify. In these circumstances it was proper for the Presiding Justice not to allow either party to put in the back door what neither party dared to put in the front door.

A doctor was allowed to testify that plaintiff's injuries were consistent with being thrown against the windshield and dashboard. The relationship between physical injury and the cause of such injury is not necessarily beyond the ken of a medical expert and the test in this state is whether the evidence may be of probable aid to the jury. *Dowling* v. *Shattuck*, 91 N. H. 234, 236; *Ricker* v. *Mathews*, 94 N. H. 313; anno. 66 A. L. R. 2d 1082. The testimony was admissible as opinion evidence.

This case was vigorously contested, competently tried and fully argued. The jury gave the evidence lengthy consideration under instructions that properly interpreted the governing statutes and the trial was not subject to prejudicial errors by the rulings of the Presiding Justice. The jury was entitled to believe that the plaintiff's testimony at the trial was true even though she may have originally told the police a different story in her attempt to protect Delude, who was her companion, at the time of the accident. The order is

*Judgment on the verdict.*

All concurred.